Opinion delivered March 16, 1889.

No. 2730.

JUAN TREVINIO v. THE STATE.

1. INDICTMENT—GRAND JURY—PRACTICE.—The defendant's motion to set aside the indictment was based upon the statutory ground that a person not authorized by law was present when the grand jury deliberated and voted upon the accusation against him. It appears by the defendant's bill of exceptions that the grand jury for the term was duly organized on December 3, and that it was discharged for the term

on December 13; that soon afterward the court took a recess, and, upon reconvening after the recess, ordered the sheriff to reassemble the sixteen persons selected originally by the jury commissioners at the June term to serve at the said December term, viz., the twelve who had been impaneled and the four who had not. Of the sixteen thus summoned, the twelve who had, and one W., who had not, been impaneled reassembled, when one of the said twelve was excused by the court, and the said W. was placed upon the panel in his stead. The contention of the defense is that the trial court had no power to excuse the grand juror after he had been duly impaneled; that the status of the excused person as a legal grand juror was not affected by the action of the court, and that the legal effect of impaneling the substituted juror, W., was to create an unconstitutional grand jury of thirteen persons; and that the presence in the grand jury room of the said W. was the presence of "a person not authorized by law." *Held,* that the motion to set aside the indictment was properly overruled, and that the action of the court was correct, as conforming to article 391, of the Code of Criminal Procedure, which provides as follows: "When a grand jury has been discharged by the court for the term, it may be reassembled by the court at any time during the term, and in case of failure of one or more of the members to reassemble, the court may complete the panel by impaneling other qualified persons in their stead, in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance." See the opinion in extenso for an elucidation of the question.

2. Assault to Murder—Evidence—Intent.—An assault and a specific intent to murder are two elements which must concur in order to constitute the offense of assault with intent to murder. The intent must be established as an inference of fact to the satisfaction of the jury, but the jury may draw that inference, as they draw all others, from any fact in evidence which to their minds fairly proves its existence.

3. Same—Presumption—Fact Case.—If the assault is voluntary, is committed with deliberate design, and with an instrument capable of producing death, and there are no extenuating circumstances, it is an assault with intent to murder. And "whenever it appears upon a trial for assault with intent to murder that the offense would have been murder had death resulted therefrom, the person committing such assault is deemed to have done the same with that intent." See the statement of the case for evidence *held* sufficient to support a conviction for assault with intent to murder.

Appeal from the District Court of DeWitt. Tried below before the Hon. H. C. Pleasants.

The conviction in this case was for an assault with intent to murder Lorenzo Hernandez, in DeWitt county, Texas, on the eighteenth day of January, 1889. The penalty assessed against the appellant was a term of three years in the penitentiary.

Lorenzo Hernandez was the first witness for the State. He testified that on the day alleged in the indictment, while he, Tulerio Trendez and Blas Martinez were standing at the corner of Keller's store in Cuero, DeWitt county, they were joined by the defendant, who asked Tulerio about getting some work. Tulerio told him of some parties who were building a brick house in town, and paying their hands a dollar and a half per day, and of some other parties with a contract to furnish wood, who were paying woodchoppers a dollar and a quarter per day. The defendant replied that he would not work for as little as a dollar and a half a day, which was too cheap, and remarked: "I have heard that there are some Mexicans who have been cutting wood for seventy-five cents a day." Witness then asked defendant: "Do you mean that remark for me? If you do, why don't you come out and say so like a man?" Defendant, with an oath, replied: "I can say that to twenty men like you. If you don't like what I have said, just follow me and we will settle it." Defendant then walked off towards the railroad crossing, and the witness followed him at a distance of about six or eight steps behind. Maintaining this distance apart, the defendant and the witness crossed the railroad, and turned down it, at right angles towards Buchel's gin. When they reached a point about one hundred yards beyond the railroad track, and nearly opposite the gin, neither having uttered a word, the defendant drew a knife from under his coat, with which he made several thrusts at the witness. The witness retreated rapidly, facing defendant, to a point about ten steps from where the first thrust was made, when the defendant reached and stabbed the witness in the right side. The witness fell into a small hollow or depression in the ground, which was full of mud. Defendant struck two or three more blows at him with the knife, but witness kept him off by kicking at him with his feet. Finally the defendant stepped back a step or two from the hollow, and looked at witness as he lay on his back. The witness then attempted to get up, when the defendant turned and walked off. The witness, when he regained his feet after the affray, saw no person near the scene of action. No person attempted to interfere in the fight, and not a word was spoken to defendant by any body while the fight lasted. After the last thrust at witness by the defendant, the witness told defendant that he had enough. Defendant thereupon made no other effort to cut or stab witness, but put his knife

back under his coat, stepped back and looked at witness who was still lying in the hollow. The wound inflicted upon the witness by the defendant was a severe one. The knife struck him in the left side and made a cut across a rib, about an inch and a half wide. If the defendant was drunk or drinking at the time of the trouble, witness did not observe it. Witness had seen the defendant but two or three times before the affray. He was unarmed and did not follow the defendant to fight, but to hear what further the defendant had to say to him.

Tulerio Trendez and Blas Martinez testified for the State substantially as did Hernandez, as to what occurred at the corner of the street near Keller's store. Neither of them followed the parties to the place where the cutting occurred, and could tell nothing about it.

Amison testified for the State that he witnessed the affray between the defendant and Hernandez from a wagon at Buchel's gin. The men were struggling with each other when witness first observed them. Defendant had Hernandez by the back of the neck, pushing him. Just about the time the witness caught sight of the parties defendant stabbed Hernandez with a knife. They were then in a little depression or hollow in the ground. As soon as he stabbed Hernandez, who fell, the defendant stepped out of the hollow, and looked at him for a very few moments. He then wiped his knife on his coat tail and put it away under his coat. Defendant struck but one blow at Hernandez that the witness saw. Hernandez, while on his back in the hollow, so far as witness saw, did not kick at the defendant with his feet, nor strike at him with his hands. When Hernandez got up he trotted off towards the railroad crossing, went across the railroad and back towards town. When he had gone ten or twelve steps, defendant started after him in a brisk trot, and followed him across the railroad. After crossing the railroad the defendant ran down the cut parallel with the track, a short distance, and then stopped and stuck his knife into the ground—the witness following him at a short distance in his wagon. Defendant then went a little further down the railroad, recrossed the track, and went into a house in the yard in the rear of Hausmann's saloon. He left the knife sticking in the ground. Nobody interferred in the fight between defendant and Hernandez. The witness saw but one blow given by defendant, and from the positions of the parties that blow could have taken effect in Hernandez's right side, but

not in his left.    Witness notified Sheriff Breeden, and pointed out to him the knife and the defendant.

Sheriff Breeden testified, for the State, that Amison reported to him the fight between defendant and Hernandez, and led him to a point near the railroad and pointed out to him a knife sticking in the ground.    That knife was a deadly weapon, being a butcher knife, sharpened at the point, and, including the handle, about a foot long.    Amison then conducted witness to a small restaurant in the rear of Hausmann's saloon, and pointed out the defendant as the man who stabbed Hernandez, and witness arrested him.

*V. B. Proctor*, for the appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    A motion was made by defendant to set aside the indictment because a person not authorized by law was present when the grand jury were deliberating and voting upon the accusation against the defendant.    This motion presented one of the two statutory grounds for which alone under our practice an indictment can be set aside.    (Code Crim. Proc., art. 523; Willson's Crim. Stats., sec. 2119.)    The facts, as shown by defendant's bill of exceptions, upon which this motion was predicated, are substantially as follows:

The grand jury for the term was duly organized on the third day of December.    On the thirteenth of December, they having informed the court that they had completed their labors, the court discharged them for the remainder of said term.    Shortly afterward the court took a recess for perhaps a month.    Upon reconvening at the expiration of its recess, the court was advised that during its recess or adjournment several parties had been arrested for felonies, who had not been indicted and who were unable to give bond.    Upon this information the court ordered the sheriff to summon the sixteen persons selected originally by the jury commissioners at the previous June term for the said December term—the four who had not been impaneled on the third of December as well as the twelve who had been, and who had acted up to the time they were discharged on the thirteenth, as aforesaid.    In obedience to the summons thirteen of the original sixteen appeared and answered to their names; that is, the entire twelve who composed

the original panel when discharged, and one Wofford, who had been one of the sixteen selected by the jury commissioners at the June term. All arrested parties, including defendant, were brought into court and afforded an opportunity for interposing challenges to the jury, as proposed to be organized, but no challenges were interposed. Lorance, one of the grand jury as originally impaneled and previously discharged, asked to be excused from the panel on account of sickness of his family, and the court excused him, and the man Wofford was retained—substituted in his place—to make out the panel of twelve men, and was, with the other eleven of the old grand jury, sworn and impaneled, and, as one of the grand jury, voted upon, found and presented the bill of indictment in this case.

It is insisted in substance that the court, under the circumstances, had no authority to excuse Lorance, he being one of the jury as originally impaneled for the term; that, the action of the court being without authority and void, Lorance was, notwithstanding said action, still a legal member of the jury; and that the swearing and impaneling of Wofford in his stead was in legal effect the placing and impaneling of thirteen instead of twelve men, the *maximum* constitutional and statutory number allowed for a grand jury; that, such being the case, Wofford was a person not authorized by law to be present when the indictment was found; and that, if the court's action gave him any authority, or constituted him one of the grand jury, then that body, being composed of thirteen men, was an illegal body and any indictment found by it was absolutely void.

If the grand jury was in fact composed of thirteen men under the facts stated, then there can be no question that the indictment would be void. (Lott v. The State, 18 Texas Ct. App., 627; McNeese v. The State, 19 Texas Ct. App., 48.) Nor can there be any question that, after a grand jury is once impaneled, it is beyond the authority and province of the court to excuse or discharge one of its members so as to relieve him from his obligations and duties as such, and that any attempted discharge by the court, until the discharge is final for the term, would be a nullity and void, leaving the juror, in legal effect, still one of the grand jury. (Smith v. The State, 19 Texas Ct. App., 95.) The power to discharge during the term, or before a final discharge of the body after completion of their labors,

is not vested either in the court or the grand jury, and in fact no such power exists anywhere by authority of law. (Watts v. The State, 22 Texas Ct. App., 572; Drake v. The State, 25 Texas Ct. App., 293; Jackson v. The State, Id., 314; Woods v. The State, 26 Texas Ct. App., 490.)

But all these rules apply alone to a grand jury whose personnel is fixed by its being organized and impaneled, and during the existence and continuance of such organization. After a grand jury has completed its labors and as a body has been discharged for the term by the court, as a body it ceases to exist, and its autonomy and personnel are in a measure, if not completely, changed and destroyed when it is sought to reassemble them. Our statute upon the subject is that, "when a grand jury has been discharged by the court for the term it may be reassembled by the court at any time during the term, and in case of failure of one or more of the members to reassemble, the court may complete the panel by impaneling other qualified persons in their stead, in accordance with the rules prescribed in this chapter for completing the grand jury in the first instance." (Code Crim. Proc., art. 391.)

We think it clear from the phraseology of this statute that it was within the contemplation and intention of the legislature that when the grand jury were reassembled they could only be reorganized and impaneled with twelve men; that there must be at least that many present; that no less number would suffice, and that, if there were not twelve present, the number should be completed by impaneling other qualified persons to make up the deficiency to twelve. If this were not the intention, and they intended the original personnel to control, it is evident that they would have provided that any nine of the original body who appeared could be entrusted with the duty of transacting the business for which they were reassembled, as is provided in article 390, Code of Criminal Procedure. We think it equally clear that when less than twelve appear it is made the duty of the court to fill up the deficiency, if practicable, out of the sixteen originally selected by the jury commissioners. (Art. 357, Code Crim. Proc.)

We think it equally apparent that, when the jury are reassembled after having once been discharged, they must be again "impaneled"; that is, tested as to qualification and sworn again. (Code Crim. Proc., art 379.) If so, then the jury is in effect a new one entirely.

If upon the reassembling twelve are requisite, and twelve appear, can the judge excuse, for good cause, one of the number and take another of the original sixteen in his place? There is no question but that, if the juror had stayed away, the court would have had the power. Does the fact that he came to court to render his excuse deprive the court of the authority to excuse him and place a new man in his stead? He had not been sworn anew and impaneled it must be remembered, and we will concede that the court might and could have impaneled him with the other eleven and left him to settle his excuses with the foreman and his fellows of the grand jury, who could and would doubtless have relieved him. Suppose the juror had appeared and had been insane, will any one for a moment doubt but that the court not only had the right, but that it would have been its duty, to excuse and stand him aside and put another in his place? Before the grand jury had originally been organized and impaneled would any one doubt that the court could have excused the juror on account of serious sickness of his family? We think not.

If the intention of the statute is that twelve men must be re-organized at the reassembly, what would be the use or the common sense in taking as one of the members a person who could not act and who would not act because of a good and sufficient reason why he should be excused from acting? Would the court do right and be carrying out the intention of the Legislature to impanel such a party? We think not. The law never requires a useless or unnecessary thing to be done. If the excuse of the juror was a sufficient one, it would have been useless for the court to have impaneled him, knowing that he would be excused and would not act nor be called upon to act by the grand jury in the matter before them. To the extent which the court had the power to hear and grant excuses in the first instance, it was authorized to act in the second; and we think the power was exercised in this second legitimately, and in conformity with the spirit and intention of article 391, Code of Criminal Procedure.

The court did not err in refusing to set aside the indictment for the grounds specified. Otherwise the indictment is not objected to, and is amply sufficient to charge assault with intent to murder.

But it is most urgently insisted that the evidence is wholly insufficient to support the verdict and judgment finding appel-

lant guilty of assault with intent to murder. It is contended that the specific offense of intent to murder is not only not shown, but is disproved by the facts, because, as claimed, appellant was armed with a deadly weapon with which he stabbed the injured party, it is true, but without killing him; that he could have killed him, but he did not do so; on the contrary, that he discontinued and ceased his assault of his own motion after having inflicted the single blow with his deadly weapon.

In assaults with intent to murder, the specific intent to kill is the essential element, and it must be proven to the satisfaction of the jury. "Two things must concur, an assault and a specific intent to kill. Without the simultaneous concurrence of these two constituent elements there can be no assault with intent to murder." (Willson's Crim. Stats., secs. 857–859; McCollough v. The State, 24 Texas Ct. App., 128; Moore et al. v. The State, 26 Texas Ct. App., 322.)

"The intent to kill must undoubtedly be established as an inference of fact, to the satisfaction of the jury; but they may draw that inference, as they draw all other inferences, from any fact in evidence which to their minds fairly proves its existence. Intentions can only be proved by acts, as juries can not look into the breast of the criminal." (People v. Scott, 6 Mich., 287–296; 1 Bish. Crim. Law, 7 ed., sec. 735.)

If the assault is voluntary, committed with deliberate design, and with an instrument capable of producing death, and there are no extenuating circumstances, it is an assault with intent to murder. (Yanez v. The State, 20 Texas, 656.) And "whenever it appears upon a trial for assault with intent to murder that the offense would have been murder had death resulted therefrom, the person committing such assault is deemed to have done the same with that intent." (Penal Code, art. 502.) We are of opinion the evidence in this case is amply sufficient to support the verdict and judgment. Having found no reversible error in the record, the judgment is affirmed.

*Affirmed.*